FILED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

00 SEP 19  AM 8: 39

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| TABBITHA COOK GADDIS, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | CV99-H-1980-S |
| TALLADEGA HEALTH CARE, INC., | ) | |
| DEFENDANT. | ) | |

ENTERED

SEP 1 9 2000

## MEMORANDUM OF DECISION

The Court has before it the June 30, 2000 motion of
defendant, Talladega Health Care, Inc., for summary judgment.
Pursuant to the Court's July 5, 2000 order, the motion was deemed
submitted, without oral argument, on August 2, 2000.

### I. Procedural History

Plaintiff Tabbitha Cook Gaddis commenced this action on July
29, 1999 by filing a complaint in this Court alleging racial
discrimination in the form of adverse employment action and
hostile work environment in violation of Title VII and 42 U.S.C.
§ 1981.  Plaintiff contended that defendant discriminated against
her because of her race by improperly eliminating her position

and transferring[1] her to another department (which plaintiff
viewed as a demotion) and by subjecting plaintiff to a hostile
work environment created by racial slurs and other inappropriate
references to her race.[2] (See Compl. ¶¶ 6-12).  Defendant's June
30, 2000 motion for summary judgment asserts that no issue of
material fact exists and that defendant is entitled to judgment
as a matter of law.  (See Def.'s Mot. Summ. J. 4).

Both parties have submitted evidence and have filed briefs
respectively supporting and opposing the motion for summary
judgment.  Defendants filed a brief and submitted evidence[3] in
support of the motion on July 19, 2000.  On July 26, 2000,

---

[1]   It is unclear whether plaintiff actually transferred or
whether she resigned before the transfer became effective.  (See
Notice of Transfer, Pl. Exh. 1).  This is immaterial to the
analysis and decision in this case.  Hereinafter, references to
plaintiff's transfer are intended to include both defendant's
offer of transfer and plaintiff's actual transfer to the
Restorative Department, if such transfer did in fact occur.

[2] In addition, plaintiff originally alleged racial
discrimination with regard to pay and constructive discharge.
(See Compl. ¶ 12).  Plaintiff has abandoned these claims.  (See
Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at 1 n.1).

[3] Defendant submitted the June 29, 2000 affidavit of Bobby
Stephenson;  excerpts from the May 23, 2000 deposition of Bobby
Stephenson; excerpts from the May 23, 2000 deposition of Stacey
Rice; and excerpts from the March 24, 2000 deposition of Tabbitha
Cook Gaddis.

plaintiff submitted evidence[4] in opposition to the motion and filed an opposing brief on August 2, 2000.  Having been thoroughly briefed, the motion is ripe for consideration.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  Id. at 323.  Once the moving party has

---

[4] Plaintiff submitted the July 25, 2000 declaration of Tabbitha Cook Gaddis; the March 24, 2000 deposition of Tabbitha Cook Gaddis; the April 28, 1998 written comments of Tabbitha Cook Gaddis to Stacey Rice;  the November 12, 1998 letter of Tabitha Cook Gaddis to Wayne Sumners; results of the THC Human Resources Survey; the July 26, 2000 declaration of Cheryl Cook; the July 26, 2000 declaration of Desiree B. Sewell; excerpts from the May 23, 2000 deposition of Bobby  Stephenson; the May 12, 1998 Report of Investigation on Charges Made by Tabbitha Gaddis; the October 8, 1998 THC Statement of Position to the EEOC; the November 10, 1998 offer letter; and excerpts from the May 23, 2000 deposition of Stacey Rice.

met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward

4

with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district

5

court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Facts

Plaintiff, an African-American female, began her employment with defendant Talladega Healthcare, Inc. (hereinafter "THC") as an Occupational Therapy Technician ("OT Tech") (an hourly employee) in 1993.[5]  (Gaddis Decl. ¶ 1)  Plaintiff remained in

---

[5] Plaintiff was previously employed with defendant as a Temporary LPN from 1991 until April 1992.  (Plaintiff did not pass her Board Examination and was offered an alternative position but voluntarily resigned).  (Gaddis Dep. at 22-32). The action does not arise out of that period of employment. (Pl.'s Brief Opp'n Def.'s Mot. Summ. J. at 1, n.2).

the Therapy Department until her resignation in May of 1998.
(Gaddis Decl. ¶ 1)    During her five-year employment with
defendant, plaintiff made only one complaint of racial
discrimination to THC management:  a handwritten complaint letter
to Stacey Rice, Rehab Director.[6] (Pl. Exh. 6).  In this letter,
plaintiff commented regarding the elimination of her OT Tech
position and her transfer to the Restorative Department.
Plaintiff noted that approximately four weeks before the
elimination of her position, she met with Stacey Rice and Steve
Wood (her immediate supervisor) who denied her request to work
part-time in order to attend school.[7] She also noted that for
the past two years of her employment, she had felt discriminated

_____

[6]  In his October 8, 1998 Statement of Position to the EEOC,
Bobby Stephenson, THC Administrator, states that no complaint of
racially hostile comments was ever received from Ms. Gaddis until
after she voluntarily resigned.  (THC Statement of Position to
the EEOC at 2). However, the April 28, 1998 handwritten complaint
letter written by plaintiff indicates that it was read by Stacey
Rice on April 28, 1998--prior to plaintiff's termination on May
15, 1998. (Def. Exh. 6).
    Plaintiff made no claim of discrimination until after the
elimination of her position. (Gaddis Dep. at 109).

[7] Stacey Rice began employment with defendant on or about
March 18, 1998 and met with plaintiff approximately one week
later regarding plaintiff's request to work less than full-time
in order to attend school.  (Gaddis Dep. at 102-04; Rice Dep. at
45). Rice conducted a review of the Occupational Therapists'
workload approximately four weeks later, resulting in defendant's
decision to eliminate the OT Tech position. (Rice Dep. at 45).

against because of her race due to preferential treatment of white technicians and racial comments from some of the therapists.  In the letter, plaintiff questioned why she was not transferred to Physical Therapy, rather than the Restorative Department, and stated that she felt pressured to quit. (Def. Exh. 6).

The racial slurs and offensive comments to which plaintiff referred in her letter occurred over the course of her five-year employment with defendant.  The comments were made primarily by her immediate supervisor. Steve Wood, and include the following and other similar comments.  (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at 2-4).

During a conversation about tanning, Wood asked plaintiff, "Where did you tan, on the bottom of your feet and the palm of your hands?"  In plaintiff's presence, Wood referred to a black person as a "tar baby."  Wood told plaintiff that she did not act like a black person because black people are usually loud and obnoxious.  After asking plaintiff why she carried a pager, Wood explained that he thought plaintiff was selling drugs because "you people that have beepers is (sic) usually selling drugs." When the lights went out at the Rehab Center, Wood said, in front of others, "Tabbitha where are you, because we can't see you."

8

(Id.).

Plaintiff also took offense to comments made by her co-employee,[8] Patsy Walton, a white Physical Therapist.(Id. at 4). In a discussion about mud wrestling, Walton commented to plaintiff that she could not mud wrestle because "we wouldn't be able to see you."  Walton also commented to another employee that she was raised to hate black people. (Id.).

Finally, plaintiff complained that a white Occupational Therapist, Link Pope, had told a supervisor that plaintiff should be fired because she didn't do anything.  (Stephenson Dep. at 31).  Neither Pope nor Walton was involved in any employment decision regarding plaintiff.

After plaintiff's written complaint, THC conducted an investigation into plaintiff's charges.  THC first interviewed plaintiff and then interviewed the employees who made the statements plaintiff complained of:  Steve Wood, Patsy Walton and Link Pope. These employees admitted making the statements, and

---

[8] Plaintiff noted other isolated comments or conduct by co-employees other than Walton (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at 4), and although inappropriate, these few incidences were not severe and add little to an evaluation of the comments made by Wood, Walton, and Pope. The analysis focuses on the comments of Wood, Walton and Pope which were the basis of plaintiff's April 28, 1998 complaint and defendant's investigation and action in response to that complaint.

THC took corrective, remedial action by verbally counseling and issuing written reprimands to the employees. (Stephenson Dep. at 32-33; Report of Investigation on Charges Made by Tabbitha Gaddis, Def. Exh. 11).

During plaintiff's employment, THC employed three OT Techs: the plaintiff, another African-American female, and a white female.  The other two OT Techs resigned in July 1997, and THC decided not to fill these vacant positions due to low caseload in the OT Department, leaving plaintiff as the only OT Tech at the time her claim arose.  (Stephenson Dep. at 17-18). It is undisputed that plaintiff was qualified to do the OT Tech job. (Stephenson Aff. ¶ 3).  In  April 1998, THC determined that the decreased caseload was not enough to keep the four staff Occupational Therapists (two Registered Occupational Therapists and two Certified Occupational Therapy Assistants) busy on a full-time basis; the OT Department was providing an average of only ten treatments per day or two and one-half treatments per therapist, per day. (Rice Dep. at 38-41; Stephenson Aff. ¶¶ 4-5). Also, changes in the Medicare reimbursement system, effective July 1, 1998, would result in THC receiving approximately $80 less per patient, per day.  Based on the low caseload and decreased reimbursement, THC decided to eliminate the OT Tech

10

position. (Id.). Around the same time (in 1998 and 1999), THC eliminated six other positions in the Therapy Department (all filled by white employees) due to the same factors. (Stephenson Aff. ¶ 6). Of all these terminations, plaintiff was the only employee offered a transfer. (Id.).

The decision to eliminate plaintiff's position was made by Stacey Rice (Rehab Director), Christy Tanner (Administrator), and Tammy Stephenson (Assistant Administrator).[9] (Rice Dep. at 40). Plaintiff viewed the transfer to Restorative as a demotion, although plaintiff understood that the new position involved the same or substantially the same pay and benefits, because she viewed the position as that of a nursing assistant. (Gaddis Dep. at 40). Plaintiff objected to the transfer because the new position required her to work four days on-two days off, thus requiring her to work some weekends, where as OT Tech, plaintiff worked five days a week with weekends off. (Gaddis Dep. at 105).

On July 13, 1998, plaintiff filed a charge of discrimination

---

[9] Plaintiff maintains that Steve Wood was also involved in the decision, because according to plaintiff, Stacey Rice and Steve Wood together informed her that "they" had decided to eliminate the OT Tech position and to transfer plaintiff to Restorative. (Gaddis Decl. ¶ 3). Defendant strongly denies that Steve Wood was involved in this decision. Whether Wood was in fact involved in the decision will not affect the decision in this case as discussed in the analysis below.

11

with the Equal Employment Opportunity Commission (EEOC) alleging that the elimination of her position on May 15, 1998 was racially motivated and that she had been subjected to a racially hostile work environment during her employment with defendant. (EEOC Charge of Discrimination (July 13, 1998)).  On April 30, 1999, the EEOC dismissed plaintiff's charge, stating that based on its investigation, the Commission was "unable to conclude that the information obtained establishes violations of the statutes." (EEOC Dismissal & Notice of Rights (April 30, 1999)).

THC gave plaintiff a right of first refusal if an OT Tech or Physical Therapy (PT) Tech position opened within the six months following her termination.  (Letter from Wayne Sumners, THC Human Resources Director, to Tabbitha Gaddis (May 27, 1998); Def. Exh. 7). On November 9, 1998, THC offered plaintiff a part-time position as a Physical Therapy Technician.  (Letter from Wayne Sumners to Tabbitha Gaddis (Nov. 10, 1998)). Plaintiff turned down the position but asked to be considered for a full-time position "equal or close to what [she] worked before." (Letter from Tabbitha Gaddis to Wayne Sumners (Nov. 12, 1998); Def. Exh. 9).  To date, defendant has not hired another OT Tech.  (Rice Dep. at 52).

12

## IV. Applicable Substantive Law and Analysis

Plaintiff's complaint contains two racial discrimination

claims under Title VII and Section 1981.[10]  First, plaintiff

alleges adverse employment action relating to the defendant's

decision to eliminate plaintiff's position and transfer her to

another department.  Second, plaintiff claims that she was

subjected to a hostile work environment arising from the racial

slurs and inappropriate race-related remarks made by plaintiff's

supervisor and co-employees over the course of her five-year

employment with defendant. Defendant's brief in support of its

motion for summary judgment asserts that plaintiff has failed to

---

[10] Plaintiff's complaint raises the same claims under Title
VII and 42 U.S.C. § 1981.  Because the elements of a section 1981
claim are identical to those of a Title VII claim, the Court need
not analyze this plaintiff's case under both theories but notes
that the outcomes for plaintiff's section 1981 claims are the
same as those discussed in the main text in connection with her
Title VII claims.   See Standard v. A.B.E.L. Servs., Inc., 161
F.3d 1318, 1330 (11th Cir. 1998) ("Both of these statutes [Title
VII and section 1981] have the same requirements of proof and use
the same analytical framework, therefore we shall explicitly
address the Title VII claim with the understanding that the
analysis applies to the § 1981 claim as well.").

The Record indicates that defendant, Talladega Healthcare,
Inc., is not a municipal entity, because it is owned by two
individuals, Roger & Betty Tyrene. (Stephenson Dep. at 8).   Thus,
the proper claim is under § 1981 (rather than under § 1983 which
is the proper provision to enforce the rights created by § 1981
against state actors.   See Butts v. County of Volusia, No. 99-
13527, 2000 WL 1146140, at *1 n.1 (11th Cir. Aug. 14, 2000)).

establish a prima facie case and has failed to offer sufficient evidence that defendant's proffered legitimate reasons for its actions are merely pretextual.  The Court will address the plaintiff's adverse employment action and hostile work environment claims separately.

## 1. **Adverse Employment Action**

As previously discussed, plaintiff presents a claim of adverse employment action under Title VII predicated upon the elimination of her position and her resulting transfer to another department.  Title VII provides generally that an employer shall not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's <u>race</u>, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1) (1994) (emphasis supplied).  Plaintiff attempts to prove her case of disparate treatment through the use of indirect or circumstantial evidence.  (<u>See</u> Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at 19-21). "In evaluating Title VII claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and <u>Texas Department of Community</u>

14

Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d
207 (1981)." Combs v. Plantation Patterns, 106 F.3d 1519, 1527
(11th Cir. 1997).

Under the McDonnell Douglas and Burdine framework, the Title
VII plaintiff first has the burden of establishing a prima facie
case of discrimination, which creates a rebuttable presumption
that the employer acted illegally.  See id. at 1527-28.  Once the
plaintiff has shown a prima facie case and, thereby, has raised
the presumption of discrimination, the burden shifts to the
employer to proffer a legitimate and nondiscriminatory reason for
its actions.  See id. at 1528.  If the employer articulates such
a reason, then the presumption of discrimination falls, and the
burden of production again shifts to the plaintiff to offer
evidence sufficient for a reasonable jury to conclude that the
employer's supposedly legitimate reason is merely a pretext for
illegal discrimination.  Although the prima facie case is
irrelevant once the employer has offered a legitimate reason for
its actions, the evidence of pretext may include the same
evidence offered to establish the prima facie case.  See id.
Despite this shifting of the burden of production between the
plaintiff and the defendant under the McDonnell Douglas and
Burdine framework, "[t]he ultimate burden of persuading the trier

of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, permitting but not compelling the trier of fact to make a finding of illegal discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

The Court now turns to whether plaintiff has established her prima facie case. The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation. See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (1984). In general, a plaintiff establishes a prima facie case of racial discrimination by showing that he or she was a qualified member of a protected

16

class and was subjected to an adverse job action but that
otherwise similarly situated employees of a different race were
treated dissimilarly.  See McDonnell Douglas Corp., 411 U.S. 792,
802 (1973).  For plaintiff's claim relating to the position
elimination and transfer in May of 1998, plaintiff must show that
"(1) [s]he belongs to a racial minority; (2) [s]he was subjected
to adverse job action; (3) [her] employer treated similarly
situated employees [of other races] more favorably; and (4) [s]he
was qualified to do the job."  Id. at 802.  The Court finds that
plaintiff has failed to satisfy this initial burden because she
has not produced evidence supporting all four elements of her
prima facie case.

    First, it is established that plaintiff belongs to a racial
minority, and it is undisputed that she was qualified to do the
job of OT Tech.  (Stephenson Dep. at 25).  The Court finds that
plaintiff cannot establish that she suffered an "adverse
employment action" resulting from the elimination of her OT Tech
position and accompanying interdepartmental transfer, because the
position to which she was or would have been transferred involved
substantially the same pay, benefits, and duties as her former
position, OT Tech.

    Plaintiff was to receive the same or substantially the same

17

pay[11] and benefits at her new position as Restorative Aide.

(Rice Dep. at 22-23, 29; Gaddis Dep. at 106-08).  Plaintiff's

primary objection to the transfer was scheduling, because the new

position required her to work some weekends.  (Rice Dep. at 51-

52; Gaddis Decl. ¶ 4; Gaddis Dep. at 108). Also, plaintiff

objected to the transfer based on a difference in duties.

(Gaddis Dep. at 106-08).  Plaintiff believed that her duties as

Restorative Aide would be more difficult than  her duties as OT

Tech,[12] and plaintiff viewed the transfer as a demotion because

---

[11] There is some discrepancy over whether plaintiff's pay
as Restorative Aide would be exactly the same as it was for OT
Tech, because plaintiff is an hourly employee and claims that she
would work fewer hours as Restorative Aide than she did as OT
Tech.  (Gaddis Decl. ¶ 4; Gaddis Dep. at 106).  However, it is
undisputed that the hourly rate of pay would be the same (Gaddis
Dep. at 105-06), and defendant asserts that plaintiff would still
work full-time (40 hours) as Restorative Aide, just as she did as
an OT Tech, with the difference being that she would work four-
on-two-off as Restorative Aide instead of working Monday through
Friday as she did in Occupational Therapy.  (Rice Dep. at 51;
Gaddis Dep. at 108).  Plaintiff presented no other evidence of
any pay discrepancy between the two positions, and it can be
inferred from plaintiff's deposition testimony that she believed
pay to be substantially the same between the two positions,
because in response to counsel's question regarding the hours,
plaintiff stated that she objected to the transfer because of
"the duties and days of the week worked." (Gaddis Dep. at 108).

[12] Defendant denies that plaintiff's duties as Restorative
Aide would not have been substantially similar to her duties as
OT Tech.  Defendant's employees stated that the two positions
involve similar duties and sometimes overlap for particular
duties (Stephenson Dep. at 58; Rice Dep. at 22-23; 29-30).

18

she believed that the Restorative Aide position was perceived as a "nursing assistant" job. (Id. At 106). Despite plaintiff's allegations of different duties, plaintiff has failed to provide sufficient evidence that her duties as OT Tech and as Restorative Aide would not have been substantially the same: it is undisputed that the primary responsibility of both positions was patient care. (Id. at 107).[13] Furthermore, neither position appeared to

---

Deposition testimony of both parties provides evidence that the duties were in fact similar because they both primarily involve patient care. See Rice Dep. at 22-23, 29-30 (testifying that both an OT Tech and a Restorative Aide would help toilet, feed, groom and transport patients); see also Stephenson Dep. at 58; Gaddis Dep. at 101, 107 (testifying that her duties as OT tech involved assisting therapists with patient care and caring for her own patients who had been "weaned off" from therapy toward restorative); and Gaddis Dep. at 106-07 (testifying that she believed the duties of restorative aide generally involved bathing, dressing and feeding patients). Plaintiff provided only testimony of her sister, a nurse at THC, who made a general unsubstantiated statement of her opinion that there was a difference in duties, (Decl. of Cheryl Cook ¶ 3; Gaddis Dep. at 42), but the alleged differences were never expounded upon and plaintiff provided no other evidence that there was any tangible difference in duties.

[13] In addition, plaintiff's complaint letter of April 1998 questioned why she was not moved to Physical Therapy instead of the Restorative Department. Plaintiff was subsequently given the right of first refusal on any OT Tech or PT Tech position that opened up within the six months following plaintiff's termination. Pursuant to this right, in November of 1998, defendant offered plaintiff a part-time Physical Therapy Technician position, which plaintiff declined. (Stephenson Dep. at 42-44; Gaddis Dep. at 118, Def. Exh. 9).

require  specialized education or certification.[14] Nothing

indicates that plaintiff was actually harmed by the elimination

of her OT Tech position and her transfer to a substantially

similar position in the Restorative Department; therefore,

plaintiff has not made her prima facie case.  See, e.g., Hudson

v. Southern Ductile Casting Corp., 849 F.2d 1372, 1375 (11th Cir.

1988) (finding no racial discrimination where a temporary

"demotion" resulted in no loss of pay or benefits); Doe v. Dekalb

County School District, 145 F.3d 1441, 1444, 1449 (11th Cir.

1998) (noting transfer not a demotion where salary, benefits,

seniority, and relative level of prestige remained the same under

the applicable objective standard and also noting as relevant

that employee did not have a particularly specialized educational

background; citing persuasive authority that "'a purely lateral

transfer, that is, a transfer that does not involve a demotion in

form or substance, cannot rise to the level of a materially

adverse employment action.'" (quoting Williams v. Bristol-Myers

Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996)).   Second, the

Court finds that plaintiff cannot establish that defendant

treated similarly situated employees of other races more

---

[14] Plaintiff testified that she has no professional
certification or license of any type.  (Gaddis Dep.  at 19-20).

20

favorably with regard to the position elimination and transfer.

It is undisputed that at the time plaintiff's claim arose on May

15, 1998, she was the only OT Tech in the THC OT Department.

(Stephenson Dep. at 17-18).  Defendant formerly employed two

other OT Techs, one African American and one white, both of whom

had left defendant's employ for other positions during July of

1997 and whose vacant positions defendant had decided not fill.

(Id.).  In addition, defendant had eliminated the positions of six

other Therapy Department employees, all of whom were white,

during 1998 and 1999; none of these employees was offered a

transfer as plaintiff was--their employment was simply

terminated.[15] (Stephenson Aff. ¶ 6).  "To make a comparison of

the plaintiff's treatment to that of non-minority employees, the

plaintiff must show that [s]he and the employees are similarly

situated in all relevant respects." Holifield v. Reno, 115 F.3d

---

[15]   Plaintiff contends that her duties were taken over by
white employees:  the duties plaintiff performed as OT Tech were
taken over by the staff therapists, who are white, once the OT
Tech position was eliminated.  However, the defendant's
legitimate purpose of eliminating the OT Tech position was
because the therapists had less than a full load.  Thus, it
follows that the therapists would necessarily take over the OT
Tech duties.  Plaintiff's duties were not taken over by an OT
Tech of another race, because there were no OT Techs employed by
THC once plaintiff's position was eliminated. This argument of
disparate treatment therefore fails.

21

1555, 1562 (11th Cir. 1997).  Relevant factors can include

involvement in the same or similar conduct, job titles,

performance of similar of substantially equal duties, reporting

to the same supervisor, requisite degree of skill or knowledge,

and whether employees are subjected to different employment

policies.  See Holifield, 115 F.3d at 1562; EEOC v. Reichhold

Chemicals, Inc., 988 F.2d 1564, 1570 (11th Cir. 1993); Lathem v.

Department of Children and Youth Servs., 172 F.3d 786, 793 (11th

Cir. 1999).  As always, the burden of producing evidence

demonstrating disparate treatment of otherwise similarly situated

employees rests with the plaintiff.  See Jones v. Gerwens, 874

F.2d 1534, 1541 (11th Cir. 1989).  Here, plaintiff has not

offered sufficient evidence to allow a rational trier of fact to

conclude that she was treated less favorably than similar, white

employees.  Because plaintiff has failed to offer sufficient

evidence that similarly situated employees of another race were

more favorably treated, her discrimination claim premised upon

her position elimination and transfer[16]  must fail.  See

---

[16] Plaintiff also makes general claims of "preferential
treatment" in terms of job assignments and pay.  (Compl. ¶ 12).
However, plaintiff provides no evidence of disparate treatment in
the job assignments of similarly situated employees of other
races.  Plaintiff alleges disparate pay with regard to a white OT
Tech, Sheila Sanford, who was formerly employed by defendant

<u>Holifield</u>, 115 F.3d at 1563; <u>Jones</u>, 874 F.2d at 1541-42; <u>Nix v.
WLCY Radio/Rahall Communications</u>, 738 F.2d 1181,1186-1187 (11th
Cir. 1984).

However, even if the Court assumes that plaintiff has
established a prima facie case of racial discrimination, the
defendants have articulated a legitimate, nondiscriminatory
reason for the elimination of the OT Tech position and
plaintiff's transfer to Restorative, which remains unchallenged.
See <u>Combs v. Plantation Patterns</u>, 106 F.3d at 1528 (explaining
that a defendant may rebut a prima facie case with a legitimate
and nondiscriminatory explanation for its actions and that the
burden then shifts to the plaintiff to show pretext).

Defendant has offered the following explanation for the

_____

until July of 1997.  Both parties agree that Sanford was paid
more than plaintiff for some period of time and both agree that
the reason for the difference in pay was that Sanford started her
employment with THC working weekends (which paid $6 per hour)
whereas plaintiff worked weekdays (which paid $5 per hour).
(Stephenson Dep. at 17-21; Gaddis Dep. at 75). Plaintiff's claim
relates to the fact that once Sanford began working weekdays
instead of weekends, her rate of pay remained at the higher
weekend rate for some time, despite plaintiff's several
complaints to management, and was not promptly adjusted downward
to the same rate as plaintiff. (Gaddis Dep. at 76). The Court
notes that plaintiff has abandoned her separate claim of
discrimination with regard to pay and has provided no other
evidence of preferential treatment of otherwise similarly
situated employees with regard to pay.

elimination and transfer:  Rice, Tanner and Stephenson decided to

eliminate the OT Tech position based on decreased caseload (i.e.,

lack of need) and decreased Medicare reimbursement.  Rice's

review of the OT Department's caseload in April of 1998 indicated

that the entire department was treating only ten patients per

day, with an average of two and one-half patients per day, per

therapist.  (See Letter from Stacey Rice to Wayne Sumner (April

28, 1998) (documenting caseload); Pl. Exh. 3).  With less than a

full caseload for the therapists, Rice, Tanner and Stephenson

decided that there was no need for an OT Tech at that time.  In

addition, changes in Medicare under the Balanced Budget Act,

effective in July 1998, would result in an $80 decrease in

reimbursement per therapy patient.[17]  Based on these two factors,

it was determined that the OT Tech position should be eliminated,

and plaintiff should be transferred to the Restorative

Department.[18]   Although plaintiff challenges the honesty of this

---

[17] In further support of defendant's articulated legitimate
reason, the Court notes that THC provided evidence that it had
been seriously preparing for the Medicare cut-backs, because it
sent Stacey Rice to training on PPS (Prospective Payment System)
as soon as she began work as THC's Rehab Director. (Rice Depo. at
42).

[18] Plaintiff contends that because she was an hourly
employee, her cost was still the same to the facility whether she
was in therapy or restorative.  However, the Medicare cut-back

decision, she has presented no evidence seriously impeaching the defendant's proffered explanation or even suggesting that racial animus motivated Rice, Tanner and Stephenson in the decision. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).

Plaintiff premises her claim on her belief that Steve Wood was also a decision maker and that his inappropriate race-related remarks evidence that, as a decision maker, he was motivated by racial animus to eliminate plaintiff's position and transfer her. Plaintiff has offered little or no evidence to support her belief that Wood was a decision maker in the decision at issue and has offered no evidence of personal knowledge of this fact. The plaintiff may truly believe that the elimination of the OT Tech position and her transfer to another position were racially motivated, but she has not come close to demonstrating pretext; once the defendant has presented legitimate, non-discriminatory reasons for its actions, the plaintiff's own subjective beliefs and allegations of discrimination, although sincerely held, cannot establish a genuine issue of material fact such as to avoid a defendant's motion for summary judgment.   See Young v.

_____

affected only the therapy department; thus, her transfer to Restorative made her a cost to Restorative--a different cost center from Therapy where the decreased reimbursement was to take effect--which serves to defeat this argument.

25

General Foods Corp., 840 F.2d 825, 830 (11th Cir. 1988).  The
Court notes that whether Steve Wood was in some way involved in
the decision to eliminate plaintiff's position and transfer her
is not significant to the decision in this case, because the
Court has found no adverse employment action and no disparate
treatment of similarly situated employees.

     To summarize, no genuine issues of material fact remain as
to plaintiff's Title VII and Section 1981 adverse employment
action race discrimination claims and defendant is entitled to
judgment as a matter of law on these claims.  Plaintiff has
failed to demonstrate the existence of a prima facie case, and
even if a prima facie case were assumed, plaintiff has not
produced sufficient evidence that the defendant's articulated
legitimate reason for eliminating the OT Tech position and
transferring plaintiff to Restorative is merely pretext for
illegal discrimination.   Therefore, summary judgment will be
entered against plaintiff on her adverse employment action
claims.   The Court will now consider plaintiff's hostile work
environment claims.

**2.  Hostile Work Environment Claim**

     As noted earlier, plaintiff presents a claim of hostile work
environment predicated on racial slurs and other inappropriate

26

race-related remarks made primarily by her supervisor[19] over the course of her five-year employment with defendant.

Plaintiff asserts a claim of racial harassment predicated upon a hostile work environment created by a supervisor's actions.  As previously discussed, Title VII provides that an employer shall not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's <u>race</u>, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1) (1994) (emphasis suppled).  Title VII permits a claim against an employer for a hostile work environment.  <u>See</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998).  A claim of hostile work environment, as relevant here, requires a showing that (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon race; and (4) the harassment complained of affected a term, condition, or privilege of employment.  <u>See</u>

---

[19]  Plaintiff also complains of derogatory race-related comments made by co-employees.  As the lion's share of the comments at issue was made by her supervisor, the analysis will focus on the supervisor's actions but will also address the actions of co-employees.

27

Henson v. City of Dundee, 682 F.2d 897, 903-04 (11th Cir. 1982). If a plaintiff fails to make a prima facie showing of hostile work environment, the court need not even reach the question of employer liability.

In order for a plaintiff to establish a prima facie case of "hostile work environment" harassment actionable under Title VII, the incidents of harassment must be "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment . . . .'"[20]   Faragher, 524 U.S. at 786 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)); see also Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995).  Title VII is not "a general civility code" nor does it protect against "'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Faragher, 524 U.S. at 788 (citing B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)(footnotes omitted)).

_____

[20] Although both Faragher and Meritor involved claims for sexual harassment, not racial harassment as alleged in this case, the Supreme Court has noted that "[even though] racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment."  Faragher, 524 U.S. at 787 n.1.

Infrequent or "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'" to constitute a violation of Title VII.[21] Faragher, 524 U.S. at 788 (citation omitted).  The severity of the behavior in each case must be evaluated both objectively[22] and subjectively considering all the circumstances, see Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998), and only the most extreme harassing conduct will be found to violate Title VII, see Faragher, 524 U.S. at 788; Oncale, 523 U.S. at 81-82.

The standard for a racially hostile environment is high: "[not] all racial slurs rise to the level of a Title VII violation." Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981). "The racial slurs allegedly spoken by co-workers [have] to be so 'commonplace, overt and denigrating that they create[] an atmosphere charged with racial hostility.'" Edwards,

---

[21] However, the determination as to whether the harassment was sufficiently severe or pervasive should not be based solely on the number of incidents alleged. See Vance v. Southern Bell, 863 F.2d 1503, 1510 (11th Cir. 1989).

[22] The objective evaluation is based on a "reasonable person" standard. See Watkins v. Bowden, 105 F.3d 1344, 1355-56 (11th Cir. 1997) (affirming the use of the "reasonable person" standard in a hostile work environment claim where the plaintiff argued that the court should have applied a more contextual standard such as "a reasonable African-American person.")

49 F.3d at 1521 (citing <u>E.E.O.C. v. Beverage Canners, Inc.</u>, 897

F.2d 1067, 1068 (11th Cir. 1990)).  The Supreme Court has noted

that the "'mere utterance of an . . . epithet which engenders

offensive feelings in an employee,' does not sufficiently affect

the conditions of employment to implicate Title VII."  <u>Harris v.</u>

<u>Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993) (quoting <u>Meritor</u>,

477 U.S. at 67).  Factors to be considered include the frequency

of the racial terms, whether the speaker directed the comments to

the plaintiff,[23] and whether the worker made the remarks

accidentally and/or as part of casual conversation.  <u>See</u> <u>Bunny</u>

<u>Bread</u>, 646 F.2d at 1257.  Also relevant is whether the utterance

was made in the presence of others so as to further humiliate the

employee.  Racial slurs that are "largely the result of

individual attitudes and relationships . . . certainly [are] not

to be condoned, [but nonetheless] do not amount to violations of

Title VII."  <u>Id.</u>

The conduct alleged by plaintiff consists of[24] racial slurs

---

[23] Remarks that were not directed at the plaintiff may still contribute to the hostile environment if the plaintiff was aware of that conduct while actually employed by defendant.  <u>See</u> <u>Edwards</u>, 49 F.3d at 1522.

[24] Plaintiff also alleged that defendant's harassment affected "a term or condition of her employment" with regard to job assignments, pay, and a demotion or reassignment with

and other inappropriate racially-based remarks made primarily by

plaintiff's supervisor and also by her co-employees, including

comments about mud wrestling, tanning, and drug dealing and

references to "black people" as "tar babies" in plaintiff's

presence, but not directed at plaintiff. (see Pl.'s Br. Opp'n

Def.'s Mot. Summ. J. at 2-4). This conduct hardly rises to the

level of being so severe and pervasive as to create a hostile

work environment.   Taken as a whole, the statements made by

Woods, Walton (and other employees) were infrequent and were

generally made as casual conversation or jokes.[25]   The undisputed

facts indicate that the work atmosphere was neither "charged with

---

significantly different duties.  The Court has fully discussed
each of these allegations under plaintiff's adverse employment
action claim and has found that defendant is entitled to judgment
as a matter of law as to these claims.

[25] It is undisputed that Walton apologized to plaintiff when
she realized plaintiff was offended by her mudwrestling comment.
Walton indicated that the comment was made as a joke by saying
that plaintiff could have said the same thing to her (Walton) if
they had been talking about wrestling in buttermilk.   (Gaddis
Dep. at 72). Plaintiff admits that she did not work closely with
Walton, who was a Physical Therapist and worked in the Physical
Therapy Department, rather than the Occupational Therapy
Department where plaintiff worked.  (Id. at 66).  Plaintiff also
admits that Walton did nothing that plaintiff felt was based on
race with regard to plaintiff's employment. (Id. at 72-73).

31

racial hostility" nor abusive.[26]   Edwards, 49 F.3d at 1521.   The

Supreme Court has repeatedly emphasized that this cause of action

is limited to extreme work conditions.   See, e.g., Faragher, 524

U.S. at 788; Oncale, 523 U.S. at 81.   Although the plaintiff is

within the class protected from racial harassment and any

harassment was unwanted, plaintiff has failed to sufficiently

demonstrate that any harassment was so severe as to affect a term

or condition of employment.   See Henson v. City of Dundee, 682

F.2d 897, 903-04 (11th Cir. 1982) (listing elements of hostile

environment claim); see also Edwards, 49 F.3d at 1521-22 ("In

deciding whether a hostile environment was created, factors to

consider include the frequency of the discriminatory conduct, the

severity of the discriminatory conduct, whether the conduct is

threatening or humiliating, and whether the conduct unreasonably

interferes with the plaintiff's performance at work."); see also

DeNovellis v. Shalala, 124 F.3d 298, 311 (1st Cir. 1997) (holding

that undesirable job assignments do not support a pervasive

hostile environment claim).   Taking as true all of the conduct

allegedly undertaken by Woods, Walton, Pope (and plaintiff's

---

[26] Despite plaintiff's allegations about her work
environment at THC, plaintiff admitted that she would have
accepted a full-time Technician position at THC again if one were
offered to her.   (Gaddis Dep. at 122).

other co-employees) during plaintiff's employment, the Court concludes that the incidents described by plaintiff are ignorant, unprofessional, and wholly inappropriate, but they are not so severe, threatening, or disruptive as to rise to the egregious level required to create an actionably hostile work environment.[27]

Because plaintiff has failed to put forth a prima facie case of hostile environment racial discrimination, defendant's motion for summary judgment is due to be granted with respect to plaintiff's Title VII and Section 1981 claims for racial discrimination in the form of harassment.

In summary, the Court finds that no material issues of fact remain and that defendant THC is entitled to judgment as a matter of law as to all of plaintiff's claims  A separate order will be entered.

DONE this __19th__ day of September, 2000.

_____
SENIOR UNITED STATES DISTRICT JUDGE

---

[27] The Court notes that an analysis of employer liability under <u>Faragher</u> is not necessary because the plaintiff has failed to put forth a prima facie case of hostile environment race discrimination.

33